UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DENA LYNN BROOKS, MARCUS )<br>JESSIE ADKINS, and COURTNEY )<br>NOBLE, JR., )<br>)<br>Defendants. ) | Criminal Case No.<br>13-cr-17-JMH<br><br>**MEMORANDUM<br>OPINION & ORDER** |

\*\*\*

This matter is before the Court upon a Motion to Suppress [DE 27] filed by Defendant Courtney Noble, Jr., in which Defendant Deena Lynn Brooks and Marcus Jessie Adkins have joined [DE 32, 34, 36, 38]. The United States of America has filed a Response [DE 39], stating its objections, Defendants have filed a Reply in further support of their motion [DE 55], and the United States has filed a Surreply [DE 56], further stating its objections to the arguments set forth in Defendants' Reply. The Court has also had the benefit of the parties' arguments and the evidence presented during a hearing on April 15, 2013 [DE 43, 50]. The Court being adequately advised, the Motion will be denied for the reasons which follow.

**I.**

On January 28, 2013, Drug Enforcement Agency ("DEA") Task Force Officer ("TFO") Scott D. McIntosh received information from a cooperating defendant about drug trafficking activity that was going to occur that day involving Defendants Dena Brooks and Marcus Adkins. [DE 50, Transcript, at 11-12.] The cooperating defendant had previously provided information to TFO McIntosh about drug trafficking activities undertaken by Brooks, Adkins, and others and had personally observed Brooks to be in possession of two plastic bags of methamphetamine in the period prior to January 28, 2013. [*Id.* at 7-11.] Specifically, he had met Ms. Brooks while she was staying at a motel in Lexington to help her change a flat tire and had seen a quantity of methamphetamine in her motel room at that time. [*Id.* at 14.]

On the day in question, the cooperating defendant told TFO McIntosh that Brooks would be travelling to Louisville to acquire a quantity of methamphetamine from her source of supply and that she would likely be in her vehicle, a white Jeep Cherokee. [*Id.* at 10-12.] When surveillance on the Interstate 64 ("I-64") corridor between Louisville and Lexington came up empty, the cooperating defendant informed TFO McIntosh that Brooks might be in Adkins' vehicle, a dark colored Chevrolet Tahoe. [*Id.* at 12-13.] He also advised that, in the past, Brooks and Adkins had obtained a motel room at Exit 115 off of

Interstate 75 ("I-75") in Fayette County and that Adkins would travel back to eastern Kentucky while Brooks would remain in Lexington at the motel.[1] [*Id.* at 13–14.]

That evening, having received information from TFO McIntosh, DEA TFO Rob Hart observed vehicles—"a dark-colored SUV" and a white Jeep Cherokee—parked at the LaQuinta Inn on Stanton Way, near Exit 115, which matched the description provided to him by TFO McIntosh. [*Id.* at 15–16, 31.] No sooner than TFO Hart had set up surveillance from a distance, the Tahoe exited the parking lot. [*Id.* at 16-17, 32.] Since Hart was not in a marked law enforcement vehicle at that time, he contacted a uniformed officer with the Lexington Division of Police to conduct a traffic stop. [*Id.* at 17, 32, 57.] He contacted Officer Adam Ray, who was on patrol, and relayed to him that he was involved in conducting surveillance on a group involved in distributing methamphetamine, that there was potentially methamphetamine in the vehicle that he was pursuing, that he did not know who was in the vehicle or anything about weapons. [*Id.* at 33, 57–58.]

---

[1] The Court takes judicial notice that I-75 "overlaps" I-64 for a number of miles in the vicinity of Exit 115 until it reaches a "split," where I-64 continues east and I-75 continues to the south, as the Court understands the direction that the parties traveled in this matter. *See* Fed. R. Evid. 201. It follows that any reference by the witnesses to either I-64 or I-75 in the immediate vicinity of Exit 115 is a reference of the same stretch of interstate highway.

At some point, the Tahoe entered traffic and travelled eastbound from Exit 115 on I-64 in the direction that one would expect if one was traveling to Wolfe County from Lexington, Kentucky. [*Id.* at 16-17.] TFO Hart and, eventually, Officer Ray followed Adkins' vehicle as it headed eastbound on I-64 in Fayette County, "just past the southern split" of I-75 from I-64 eastbound. [*Id.* at 41, 58-59.] Ray observed the vehicle cross the center lane briefly into the right lane and return to its original lane and, from a position in traffic next to the Tahoe, that the front window tinting appeared excessively dark. [*Id.* at 59.]

Officer Ray activated his emergency equipment and stopped the Tahoe on the grounds that it had excessive window tinting and had crossed from the center lane into the right lane. [*Id.* at 59.] Once the vehicles were stopped on the side of the road, Ray approached from the passenger side of the vehicle. [*Id.* at 58-60.] He spoke with the driver, Marcus Adkins, and advised him that he had been pulled over for a lane violation and for a window tinting violation. [*Id.* at 60.] Adkins denied being under the influence of alcohol or any medication but said that he had been looking at his cell phone at that time. [*Id.* at 60-61.]

During that time, Officer Ray observed that Courtney Noble, Jr., the passenger in the Tahoe, was extremely nervous. Noble

was holding a can of soda—an Ale-8-One, to be exact—in his right hand. [*Id.* at 61.] Officer Ray observed that Noble "held it in his lap and it was shaking a lot more than it should have been, even some more that I haven't even addressed him yet." [*Id.*] Based on his experience as a patrol officer and armed with the limited information that Hart had provided about why the vehicle was of interest to law enforcement, Ray felt that this evidenced an individual who was far more nervous than someone would ordinarily be during a traffic stop "unless something else is going on." [*Id.*]

After obtaining Adkins' driver's license and registration, Ray went to his cruiser to retrieve a tint meter. [*Id.* at 62.] He returned to the Tahoe and tested the window. [*Id.*] Upon concluding that the tint level was in violation of the applicable law, he asked Adkins to step out of the vehicle and observed him to determine whether he was driving the vehicle under the influence of alcohol or another intoxicating substance. [*Id.* at 62-63.] Having assured himself that Adkins was not under the influence, Ray asked Adkins why his passenger was so nervous. [*Id.* at 63.] Adkins told Ray that he did not know why. [*Id.*] Officer Ray then asked if there was anything illegal in the vehicle of which he needed to be aware, and Adkins replied, "Not to my knowledge." [*Id.*]

Ray then asked Adkins for consent to search the Tahoe, which Adkins granted. [*Id*.] Ray conducted a *Terry* frisk on Adkins. [*Id*.] Then Hart pulled up behind him, approached the scene, and waited with Adkins while Ray approached Noble on the passenger side of the Tahoe. [*Id.* at 63-64.] Ray explained to Noble that he had been given consent to search the vehicle by Adkins and asked Noble to exit the vehicle. [*Id.* at 64.] He described Noble as "extremely nervous." [*Id*.] After Noble exited the vehicle, Ray explained to Noble that he would pat him down for weapons and began to conduct what Ray described as a "*Terry* frisk" using his usual method, by taking Noble's hands and placing them behind his back, grasping Noble's index fingers, and having him separate his feet. [*Id.* at 65.] Officer Ray knew, "[t]hrough [his] training and experience [that] subjects that are involved in narcotics more times than not will carry a weapon to protect themselves from being robbed, knives, guns, etc." [*Id.* at 75.] As was Ray's usual procedure, he first went to Noble's "right pocket, right waistband." [*Id.* at 65.] Ray testified that "[m]ost people are right-handed, that if they were to have a weapon, that's where it would be." [*Id*.]

There, at first contact, he felt what he thought was crack cocaine. [*Id.* at 65-66.] He "heard the crumpling of a plastic bag, and it just had the feel and texture of suspected crack

cocaine" based on his training and experience. [*Id.* at 66.] When Noble denied knowledge of what was in his pocket, Ray placed handcuffs on Noble and removed the plastic bag from Noble's pocket. [*Id.* at 66-67.] Once Ray had the substance "under the light, it looked like methamphetamines" to him. [*Id.* at 67.] With Noble in handcuffs, Ray continued his pat down, locating two more plastic bags, each containing suspected methamphetamine, a pill bottle, a glass smoking pipe, and a small pistol, "loaded with one in the chamber," tucked in his waistband. [*Id.*]

## II.

There is no real dispute among the parties that Officer Ray permissibly stopped Adkins' vehicle in keeping with the Fourth Amendment because he "[knew] or reasonably believe[d] that the driver of the car [was] doing something that represent[ed] a violation of law" – in this case committing a lane violation or having excessive window tinting in violation of Kentucky law. *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010); *United States v. Street*, 614 F.3d 228, 232 (6th Cir. (2010) ("When law enforcement officers witness a traffic violation, they may stop the driver and his car."); *Jackson v. Commonwealth of Ky.*, No. 2009-CA-001522-MR, 2011 WL 831704, *4 (Ky. Ct. App. Mar. 11, 2011) (citing KRS 189.110). Defendants argue, however, that Officer Ray outstepped the boundaries set for him by the

Fourth Amendment's prohibition on unreasonable searches and seizures when he asked the parties to exit the vehicle and then conducted a Terry frisk or limited pat-down search of both Adkins and Noble.

If an initial traffic stop is illegal or the detention exceeds its proper investigative scope, items seized during that stop must be excluded from the evidence in a matter under the "fruits of the poisonous tree doctrine." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). Defendants argue that the traffic stop, i.e., the "detention," exceeded its proper investigative scope for two reasons: (1) the traffic stop for a citable traffic offense (as opposed to one where arrest would be permitted without more than the offense itself) did not justify a full search of the vehicle and, (2) whether the search was proper or not, Officer Ray did not have a basis upon which to perform a *Terry* frisk of Defendant Noble. The Court disagrees on both points.

First, Defendants argue that because the purpose of the stop was completed at the time the vehicle search began, there was no further cause to detain the occupants of the vehicle in the absence of something that occurred during the stop which caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot. While a simple

traffic stop for a citable offense like overly tinted windows would not, without more, justify a full search of the vehicle, there was more in this case. *See Knowles v. Iowa*, 525 U.S. 113, 117-19 (1998); *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir. 1995) (holding that motorist could not be lawfully detained once the purposes of the initial traffic stop were completed); *United States v. Carter,* 14 F.3d 1150, 1153-54 (6th Cir. 1994) (holding that any consent given by a defendant after an illegal detention has begun is rendered invalid as the fruit of an illegal arrest), *abrogated on other grounds by Brendlin v. Calif.*, 551 U.S. 249 (2007); *see also* KRS 189.110 (providing that a person shall not operate a motor vehicle on a public highway, road, or street with certain proscribed obstructed windshields or windows) and 189.990 (providing that a person who violates KRS 189.110 shall be fined). Simply stated, the traffic stop was ongoing when Ray asked for and received consent to search the vehicle from Adkins.

Officer Ray had just used a tint meter to determine that the tint on the windows was, in fact, in violation of Kentucky law but had not yet issued a citation when he asked Adkins to exit the car, observed him for any signs of intoxication, asked him whether there was anything illegal in the vehicle, then requested and was provided consent to search the vehicle. From the testimony of Officers Ray and Hart, both of whom were

present on the scene of the traffic stop, it is clear that all of these actions took place in a very short period of time – a couple of minutes at the most – and before a citation was issued. There is no evidence that Officer Ray prolonged the stop prior to issuing a citation in any way for the purpose of getting consent to search from Adkins. In other words, Adkins' consent to the search of the vehicle was not rendered invalid by an illegal detention. *See Carter,* 14 F.3d at 1153-54.

"'[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977)). Further, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Id*. (citing *Mimms*, 434 U.S. at 112). In *Maryland v. Wilson*, 519 U.S. 408 (1997), the Supreme Court "held that the *Mimms* rule applied to passengers as well as drivers." *Johnson*, 555 U.S. at 330 (citing *Brendlin,* 551 U.S. at 263). ""Specifically, the Court instructed that 'an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.'" *Id*. (quoting *Wilson*, 519 U.S. at

415). The Supreme Court noted that "the same weighty interest in officer safety. . .is present regardless of whether the occupant of the stopped car is a driver or passenger." *Id*. (quoting *Wilson*, 519 U.S. at 413).

Thus, the Court turns its attention to the only issue remaining – whether the *Terry* frisk that Officer Ray then conducted on Defendant Noble after he was asked to exit the Tahoe to facilitate the search was reasonable. By the time that Officer Ray asked Noble to exit the vehicle so that a search of the vehicle could be performed, Ray had already observed Noble's visibly nervous behavior. Ray had seen that, as he first approached the Tahoe and talked to the driver through the passenger side window, Noble was far more unsettled than most people who were the subject of a traffic stop in Ray's experience. In fact, Noble was shaking so hard that Ray could see that the can of soda held in Noble's right hand was visibly moving as he held it in his lap. Officer Ray also knew that the vehicle was the subject of a federal investigation into drug trafficking, as communicated to him by TFO Hart. He surmised, reasonably, that there could be drugs or other evidence of drug trafficking present and knew that he was faced with one very nervous passenger. He also knew from experience and common sense that individuals involved in drug trafficking are often armed to protect themselves and their contraband goods. In

other words, Officer Ray reasonably concluded that Noble might be armed and dangerous, and, thus, the basis for the *Terry* frisk that he conducted was proper.

Having concluded that the basis for the *Terry* frisk was proper, the Court next examines "'whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances.' " *United States v. Garza,* 10 F.3d 1241, 1245 (6th Cir. 1993) (quoting *United States v. Hardnett,* 804 F.2d 353, 356 (6th Cir. 1986)). Because a *Terry* frisk is "for the limited purpose of ensuring the safety of the officer and others around him, the search must 'be confined in scope to an intrusion reasonably designed to discover'" weapons that could be used to assault the officer. *United States v. Campbell,* 486 F.3d 949, 955 (6th Cir.2007) (quoting *Terry,* 392 U.S. at 29). As a "plain touch" corollary to the already established plain view doctrine, an officer may seize contraband detected during a *Terry* frisk if the object's identity is "immediately apparent" to the officer's touch. *Minnesota v. Dickerson*, 408 U.S. 366, 375 (1993).

Neither Noble nor anyone else for that matter suggests that the frisk was, at any point, physically too intrusive, only that it was unwarranted in the first instance. Thus, there is no

suggestion that Officer Ray's frisk of Noble was unremarkable in scope or duration. In fact, it was at his first, limited contact with Noble's front, right-hand pants pocket, where Ray testified that he always searches first because "[m]ost people are right-handed, that if they were to have a weapon, that's where it would be," Officer Ray discovered what he believed to be contraband—a small plastic bag containing a substance which, by touch, the officer believed to be crack cocaine. Ultimately, once it was out of Noble's pocket and he could examine it more closely, Ray concluded that it was methamphetamine. Noble had been placed in handcuffs upon the discovery of the suspected narcotics, and the pat-down (now incident to arrest) continued, turning up two more plastic bags with suspected methamphetamine, a pill bottle, and a glass smoking pipe, as well as a small pistol, "loaded with one in the chamber," tucked inside Noble's waistband. Having determined that it was appropriate to conduct the pat down, the Court also concludes that it was not unreasonably intrusive. In light of the facts presented, that the frisk was within the proper scope laid out in *Terry*.

Accordingly, for all of the reasons stated above, **IT IS ORDERED** that Defendants' Motion to Suppress [DE 27] is **DENIED**.

This the 30th day of April, 2013.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge